UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,

    -against-

MANUEL SANTOS,

       Defendant.

-------------------------------X

<u>MEMORANDUM AND ORDER</u>

Criminal Action No.
CR-01-537 (DGT)

Trager, J:

    Defendant Manuel Santos was charged with murdering Wilber
Garces and his fourteen-year-old stepson Edgardo Bryan on the
evening of September 26, 2000, and with using a firearm in
furtherance of a crime of violence in violation of 18 U.S.C.
§ 924(c)(1)(A)(iii).  He was tried before a jury and convicted.
Santos was sentenced to two concurrent terms of life imprisonment
for the murders and a consecutive sentence of ten years'
imprisonment for the § 924(c) firearm offense.  Santos appealed,
challenging the application of 21 U.S.C. § 848(e)(1)(A) to the
set of facts the government proved at his trial and the
sufficiency of the evidence forming the basis of his conviction.
The Court of Appeals for the Second Circuit affirmed.  <u>United
States v. Santos</u>, 541 F.3d 63 (2d Cir. 2008), <u>cert. denied</u>, 129
S. Ct. 960 (2009).  Santos then filed this motion for a new trial
pursuant to Rule 33 of the Federal Rules of Criminal Procedure,
citing newly discovered evidence.  Santos also argues that some

of the information on which he bases his Rule 33 motion was available to the government before his trial and should have been disclosed under Brady v. Maryland, 373 U.S. 83 (1963). In a related claim, Santos asserts that, because some of this information was available to the government at trial, it suborned perjury by allowing one of its main witnesses to testify inconsistently with that information. Santos also has a pending motion for resentencing in which he argues that, in light of the Second Circuit's recent decision in United States v. Williams, 558 F.3d 166 (2d Cir. 2009), his ten-year sentence for Count Three, the § 924(c) count, should be vacated.

Because none of the information on which Santos bases his Rule 33 and Brady claims constituted admissible evidence, or would lead to admissible evidence, and because the government introduced more than sufficient evidence corroborating its principal witness and Santos's participation in the murders, Santos's motion for a new trial is denied. His remaining motions and requests for discovery and for evidentiary hearings are also denied.

## Background

### (1)

Santos was recruited by Carlos Medina to carry out the shooting that culminated in the deaths of Garces and Bryan.

Medina cooperated with the government and testified for the prosecution at Santos's trial.

According to Medina, he worked for a man named German Polanco, who had $316,000 in cocaine-sale proceeds stolen from him. Polanco blamed the theft on two men, known to Medina only as "Ronnie" and "El Renco," and assigned Medina the duty of hiring men to kill them. Another Polanco associate named Luis Rodriguez, who was present when Polanco gave Medina his assignment, volunteered to supervise the shooting on Polanco's behalf. Polanco agreed, and Rodriguez served as Polanco's go-between in organizing the shooting while Medina retained authority to hire the shooters.

Medina hired Santos and another man named Alex Core for the job. After explaining the reason for the shooting to Santos, Medina agreed with Santos on payment terms and, on the morning of September 26, 2000, drove him and Core to "Ronnie"'s residence in Queens so he could point it out to them. That afternoon, Medina, Santos and Core returned to that location and parked in a parking lot on 101st Street and Park Lane South across from "Ronnie"'s residence, where they waited for "Ronnie" and "El Renco."

Later that same evening, Garces and Bryan left the house Medina, Santos and Core had been monitoring, crossed the parking lot, entered a car and pulled out of the parking space. As their car reached the exit of the parking lot, Santos blocked the car

with his SUV.  Santos and Core then jumped out of the SUV and
shot several rounds into the car.  Garces and Bryan died from the
gunshot wounds sustained in the encounter.  Intending to kill
"Ronnie" and "El Renco," Santos and Core had instead murdered
Garces and Bryan, Garces's fourteen-year-old stepson.

Core's friend, Wilfredo Acosta, corroborated Medina's
account of what happened that day.  Acosta testified that,
earlier in the day, he had joined Medina, Santos and Core in
their stakeout of "Ronnie"'s residence and that the three of them
intended to kill certain inhabitants of the residence.  Acosta
also saw that Santos and Core had guns.  Apparently feeling
apprehensive about the shooting, Acosta jumped out of Core's van
while Core drove him back to his neighborhood.  Finally, Acosta
testified that weeks after the murders Santos told him that he
had done most of the shooting because Core's gun jammed.

The government supported Medina's and Acosta's accounts of
these events with ballistics evidence.  In 1999, Santos had been
involved in a physical altercation at a bar with another patron
known only as "Sweets."  Santos had pulled a gun on "Sweets," who
grabbed the gun and shot it into the ceiling.  Ballistics
analysis presented at trial linked the casings from that shooting
with casings recovered from the murder scene.

Lastly, the government introduced telephone records from a
calling center in Brooklyn from the evening of September 26,

2000.  The records showed that two calls were made within one

minute of each other – one to Santos's home and one to Polanco's

pager – which comported with Medina's account that he called

Polanco after the murders and that Santos was in the calling

center with him.

## (2)

Well after trial, the government filed two letters under

seal, dated June 1 and December 31, 2009, disclosing to Santos

the statements of six informants: three confidential sources

("CS-1," "CS-2" and "CS-3") and Jose Guerrero ("Guerrero" or

"Harry"); Eudaldo Jaramillo Aguilar ("Aguilar" or "Lalo"); and

Tomas Rojas Bermudes ("Bermudes," "El Rinco" or "Rincon").  The

true identities of the confidential sources were disclosed to

Santos's counsel but remain sealed from Santos and the public.

All six informants provided versions of the events surrounding

the murders that were different from the facts shown at trial.

All six accounts are summarized below.[1]

---

[1] Because most of the primary, secondary and tertiary
sources are known by a number of names and aliases, a key is
provided below.  Some of the aliases have not been conclusively
connected with real names; question marks signal where the
connection between alias and identity is inconclusive.

| True Identity | Alias(es) |
|---|---|
| Wilbur Garces | "Jose Libardo Hurtado," "Tula" or "Tulita" |
| Ronnie Chavez | "Douglas Gorut" or "Ronnie"(?) |

The government's December 31, 2009, letter disclosed that
CS-1 spoke with agents from Immigration and Customs Enforcement
and Assistant United States Attorneys ("AUSAs") Colleen Kavanagh
and Carrie Capwell in early 2004 (before Santos's trial in
November 2004).  In his initial proffer, CS-1 told the government
that he had heard that "Tulita" had participated in break-ins at
the Howland Hook Marine Terminal ("Howland Hook") on Staten
Island and that he had heard that "Tulita" and his son-in-law
were killed at a red light on Atlantic Avenue because "Tulita"
had stolen drugs from one of the bags "Tulita" had taken from
Howland Hook.  CS-1 related that the shipment from which "Tulita"
stole belonged to "Tabla"[2] and that there was only one shooter.

| William Montano | "Willita Montanyo" |
|---|---|
| Luis Eduardo Buenos Ruiz | "Jorge Rodriguez" or "Luisito"(?) |
| Jose Guerrero | "Harry" |
| unidentified | "Bogotano" or "Bogota" |
| Eudaldo Jaramillo Aguilar | "Lalo" |
| Jose Escobar Orejuela | "Tabla" |
| Tomas Rojas Bermudes | "El Rinco," "Rincon" or "El Renco"(?) |

    [2] "Tabla" was one of the nicknames used by a Colombian drug
boss named Jose Escobar Orejuela.  In a case unrelated to the
murders of Garces and Bryant, Escobar pled guilty to a cocaine
importation conspiracy and was sentenced to 360 months'
imprisonment.  United States v. Garay, Nos. 04-CR-193 (DGT) & 04-
CR-515 (DGT).  That multi-defendant case involved the importation
of cocaine through Howland Hook.  At Escobar's direction, crews
would break into shipping containers temporarily stored at
Howland Hook and "steal" the smuggled cocaine from them.

    Except for Bermudes, all of the informants' initial
discussions with the government concerned the Howland Hook scheme
or related conspiracies.  It was in the course of those

CS-1 claimed that he had heard that "Harry" was the shooter but later contacted AUSA Kavanagh, through his attorney, to tell her that he thought it was "Ronnie."  Finally, in November 2005, CS-1 told the government that he had heard that "Tulita," while working for "Tabla," had been stealing drugs and selling them to "Ronnie," who killed "Tulita" so he would not have to pay him. CS-1 claimed that he heard these rumors "on the street" and never identified his source.

The same letter also disclosed that, in November 2005, CS-2 told the government that he had heard that "Tulita" was part of the break-in crews that removed shipments from Howland Hook.  CS-2 further stated that "people say" "Tulita" was killed during a robbery.

In the same letter, the government disclosed that, in January 2006, CS-3 told the government he had known "Tula" for ten years and that they had met in Colombia.  CS-3 had heard that "Ronnie" may have had "Tula" killed.  He further stated that he had heard from a man named "Robert" that "Lucito" killed "Tula." He also heard, presumably not from "Robert," that "Bogota" killed "Tula" and that someone else was collecting money to have

_____

discussions that the informants related what they had heard about the murders.  Only one meeting touching on the murders – CS-1's 2004 proffer session – predated Santos's trial.  The earliest such <u>post-trial</u> discussion occurred when Guerrero met with the government to discuss the Howland Hook conspiracy in September and October 2005.

"Bogota" killed.

In its earlier June 1, 2009, letter, the government revealed that it had spoken to Guerrero and Aguilar – who had given proffers to the government in the Howland Hook case – and Bermudes. Guerrero provided conflicting accounts of what he had heard on the street. In May 2009, he stated that William Montano told him that "Bogotano" killed Garces for stealing drugs from shipments that came into Howland Hook. According to Montano, "Bogotano" intended to kill Guerrero as well for the same reason. When Guerrero confronted "Bogotano," "Bogotano" denied killing Garces and related that he had heard a different version: that "Ronnie" and Aguilar had hired a man named "Luisito" to kill Garces. In earlier discussions with the government, which took place in September and October 2005, Guerrero stated that, while he was drinking at a bar several years earlier, he heard that Aguilar and "Ronnie" had ordered Garces's murder and that "Luisito" was the shooter.

Aguilar, for his part, told prosecutors and DEA agents in April 2009 that he was not involved with the murders of Tula and Bryan. Aguilar went on to tell them that he had heard a rumor that "Ronnie" may have had something to do with the murders but that he did not believe so.

Bermudes provided Polanco's defense team with an unsworn written statement in April 2009, which was later turned over to

Santos.[3]  Bermudes's written statement was dictated over the
telephone in Spanish to one of Polanco's investigators, William
Acosta (no relation to Core's friend who testified at Santos's
trial).  In that statement, Bermudes recounted, among other
things, that Ronnie Chavez had hired Medina and "some friends of
[Medina's]" to kill "Tula."  Bermudes stated that this was only
speculation based on his conclusion that the murderers must have
known "Tula," but Bermudes did claim some personal involvement in
the aftermath of the murders in his written statement.
Specifically, he claimed that, a few days after the murders,
Chavez asked Bermudes to retrieve a bag from the house that
Garces and Bryan had exited just before they were killed.
Bermudes claimed that he did indeed retrieve the bag, gave it to
Chavez and accompanied Chavez when Chavez met with Medina to give
Medina the bag.  Bermudes further stated that he knew Medina and
that he personally spent time with Medina, Chavez and Garces
together.  Furthermore, Bermudes stated that Garces was his
cousin, that Garces introduced Bermudes to Chavez, that Garces
had "business deals" with Medina and that, on several occasions,
he saw Bryan, Garces's stepson, playing with Medina's dog.

---

[3] Polanco was convicted after a jury trial of the murders of
Garces and Bryan in March 2010.  In preparation for Polanco's
trial, the prosecution in that trial traveled to Colombia in
August 2009 and spoke with Bermudes in the presence of agents
from the Drug Enforcement Agency ("DEA").  A summary of the
interviews was also provided to Santos.

Bermudes spoke with the government over two days in August 2009, after the written statement was given, and admitted that much of his written statement was speculation. Additionally, his accounts of how he knew Chavez and Medina and of the events surrounding the murders were riddled with inconsistencies. First, Bermudes stated that Chavez and "Luisito," whom he did not mention in his written statement, had killed "Tula." He attributed this account to "Esteban Jaramillo."[4] Second, Bermudes left Medina out as a participant in the murders. Indeed, he was not able to identify a mugshot picture of Medina and misidentified both Santos and Rodriguez as Medina.[5] Furthermore, he described Medina as a tall, muscular man with a light complexion. Medina is in fact rather short and slight. Bermudes also described Medina's dog – the dog he claimed Bryan played with – as a large white dog, which contradicts his written statement, in which he described it as a large, black rottweiler. Third, Bermudes identified a picture of Chavez but, although Bermudes correctly reported Chavez's surname to Polanco's investigator, Bermudes told the government that it was "Rivera." Fourth, Bermudes confirmed his account about retrieving the bag

---

[4] It is not known what relation, if any, "Esteban Jaramillo" is to Eudaldo Jaramillo Aguilar, who engaged in proffer sessions with the government.

[5] Although Bermudes misidentified pictures of both Santos and Rodriguez as Medina, he later recanted his identification of Santos, saying he did not know the person pictured.

but contradicted his written statement in which he said he
accompanied Chavez to a meeting with Medina.  Instead, Bermudes
told the government that he gave Chavez the bag after which
Chavez drove off alone.  Finally, Bermudes told the government
that he met Polanco in prison and formulated his theory of the
murders by reconciling the different versions he had heard in
prison and on the street.

Despite Bermudes's repudiation of many of his earlier
statements when he spoke to the government, I insisted that the
government make Bermudes available for co-defendant Polanco's
trial in March 2010 to address his non-hearsay contradictions of
Medina's testimony, albeit not directly related to the killings.
Accordingly, the trial was postponed to allow Bermudes to fly to
New York from Colombia to testify.  Ultimately, after meeting
with an attorney, Bermudes invoked his Fifth Amendment right not
to testify.  Apparently embarrassed by Bermudes's later disavowal
of his account in the written statement and refusal to testify,
the investigator, William Acosta, called Bermudes the day after
he returned to Colombia presumably to talk about his refusal to
testify.[6]  Bermudes claimed, in that conversation, that he had

_____

[6] Santos's post-conviction counsel did not ask for an
investigator until after Bermudes had been made available and
refused to testify.  Counsel then requested Acosta, the same
investigator who took Bermudes's statement while employed by
Polanco.  The investigator's work left much to be desired.  Not
only was Bermudes's statement unsworn, but it also bore glaring
contradictions.  Nonetheless, because portions were non-hearsay,

11

changed his mind because he was confused and because he had been threatened by the government.  Trial Tr. 1086, Mar. 22, 2010, United States v. Polanco, No. 07-CR-780 (DGT).


**(3)**

The instant motion for a new trial pursuant to Rule 33 of Federal Rules of Criminal Procedure is based on the statements of the six informants contained in the government's letters and on Bermudes's unsworn written statement.[7]  In the instant motion, Santos also argues that the informants' statements were Brady material.  In a related claim, Santos argues that the government may have suborned perjury by allowing Medina to advance the mistaken-identity theory at trial.  Alternatively, Santos asks that the government be compelled to provide additional discovery.

_____

the government was ordered to arrange for the witness to be brought from Colmobia for the trial where he refused to be a witness.  It is unclear why Santos's counsel, in light of all the limitations of Bermudes's account, would have requested the same investigator.

[7] Santos previously filed a motion for a new trial based on the videotape expert's apparent retraction of his testimony authenticating the surveillance video shown at trial.  The Second Circuit held Santos's appeal in abeyance on June 7, 2007, to allow Santos to file the new-trial motion but affirmed the Court on statutory and sufficiency-of-the-evidence grounds on September 2, 2008.  I denied the first new-trial motion from the bench on April 3, 2009, after a hearing.  The renewed (or second) new-trial motion was filed on June 4, 2009, but the final amendment to the opening brief was not filed until March 11, 2010.

## Discussion

### (1)

### Rule 33 Motion for New Trial

Rule 33 of the Federal Rules of Criminal Procedure allows district courts to grant a criminal defendant a new trial "if the interest of justice so requires."  "A new trial . . . based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'"  United States v. Owen, 500 F.3d 83, 87 (2d Cir. 2007) (quoting United States v. Alessi, 638 F.2d 466, 479 (2d Cir. 1980)).  The probability-of-acquittal factor "presupposes, of course, that the proffered new 'evidence' would be admissible at the new trial."  United States v. Parker, 903 F.2d 91, 102-03 (2d Cir. 1990).

Santos argues that whether the informants' statements are Brady or not, he is entitled to a new trial because the statements are exculpatory evidence.  The gist of Santos's argument is that the informants' accounts contradict the government's theory at trial that Santos mistakenly killed Garces and Bryan thinking they were "Ronnie" and "El Renco."  Santos's theory, based on the informants' statements, turns the government's version of events on its head.  According to Santos,

13

the informants' statements support the conclusion that Garces, also known as "Tula" or "Tulita," was actually the <u>intended</u> victim; Santos also concludes that Chavez – rather than being the intended target – was the mastermind behind the murders.  Santos explains that Garces was part of a group of people who broke into Howland Hook to transport bags of drugs from the port and that he was killed by Chavez because Garces stole drugs from one of those bags.  Alternatively, Santos seems to claim that Chavez could have ordered two men known as "Bogotano" and "Lalo" to kill Garces.

The government's principal argument in opposition is that none of the new information is admissible evidence, as is required in a motion based on "newly discovered evidence."  The government observes that none of the informants had personal knowledge of the murders or could identify a single source with personal knowledge and that their accounts are "largely inconsistent," both with each other and internally.

The government is correct that Santos provides no admissible – or credible – new evidence.  First, Santos glosses over the discrepancies in the informants' stories by keying them all to the theme that Garces was a drug dealer and "Ronnie" was somehow involved in the murders.  Even painted this broadly, this theory does not cohere to all the accounts offered by the informants. For instance, CS-1, on whose accounts Santos chiefly relies,

offered two versions of the murders: one which suggested that "Ronnie" killed Garces for stealing from Escobar and one in which "Ronnie" committed the murders so he could avoid paying Garces. CS-1 further confused the matter by originally attributing the murders to "Harry."  CS-3 told the government two versions as well: that "Lucito" had committed the murder and that "Bogota" had done it.  Guerrero told similar stories to those related by CS-3, and like CS-3's accounts, his conflicted with each other.

Second, none of the informants' statements would be admissible at trial or could possibly lead to admissible evidence.  They are all hearsay or speculation.  The problem of hearsay is endemic to a theory with such tenuous sources whose accounts vary so widely.  It is, thus, not surprising that not one informant could name a single identifiable witness with personal knowledge of Santos's version of events.  In the one instance when the government tracked down a secondary source – i.e., when it spoke with Aguilar – he provided a different rumor.

Even if the informants could provide admissible evidence, their testimony at trial would necessarily be too inconsistent for Santos to rely on for his acquittal.[8]  See <u>United States v.</u>

---

[8] In his reply, Santos faults the government for deporting "all of the individuals who would have been of any value in developing admissible evidence" from information they previously provided to the government.  The government disclosed in its December 31, 2009, letter that CS-1, CS-2 and CS-3 had been deported to Colombia earlier that year.  As convicted drug importers, they were all subject to nearly automatic removal.

<u>White</u>, 482 F.2d 485, 488-89 (4th Cir. 1973) (denying a motion for a new trial based on the statements of people whose testimony, if they "were offered as witnesses on a retrial of [the defendant], . . . would appear so contradictory and unreliable that they would not be believable.") Indeed, some of their statements would be contradicted by basic, undisputed facts, such as the location or year of the murders. For instance, CS-2 heard that Garces was killed during a robbery, and CS-1 heard that he was killed at a red light on Atlantic Avenue in Brooklyn. CS-1 also heard that the murders took place in 2002, not 2000.

It should also be noted that, even though Bermudes provided the only non-hearsay statements, Santos avoids detailing any of them in his briefs. Undoubtedly, this is because Santos cannot account for Bermudes's patent unreliability. In his unsworn written statement, Bermudes claimed to have spent time with Medina and to have witnessed Ronnie Chavez handing the bag Bermudes had stolen to Medina. But, when Bermudes spoke to the government, he identified photographs of Santos and Rodriguez as Medina, and the story he told about stealing the bag was inconsistent with his prior version in which he saw Chavez hand

_____

See 8 U.S.C. § 1227(a)(2)(B)(i); <u>Padilla v. Kentucky</u>, 130 S. Ct. 1473, 1480-81 (2010). It would be unreasonable to require the government to delay a convicted offender's removal based on his ability to provide hearsay statements relating to cases which may have been brought in the past. The speculation proffered by the informants in this case lend no support to Santos's suggestion that the government had a bad faith motive in deporting them.

the bag to Medina. Bermudes's assertion about witnessing Bryan play with Medina's dog had some support from a witness at Polanco's trial, but the jury obviously rejected that connection when it convicted Polanco.

Perhaps more damning is that Bermudes himself admitted in both his statements to the government and to Polanco's investigator that his theories about the murders were based on speculation and rumor. In his unsworn statement, Bermudes claimed no personal knowledge of the murders. Rather, his conclusion that Chavez and Medina killed Garces and Bryan rested in part on his assumption that the victims knew the killers because Garces would not have stopped his car or rolled down his windows for a stranger. In his later discussions with the government, Bermudes first claimed that "Esteban Jaramillo" was his source, but then stated that he formed his conclusions based on rumors he heard on the street and in prison. Additionally, Bermudes, when previously made available as a witness, asserted the Fifth Amendment privilege against testifying. Santos does not explain why Bermudes would act any differently if called as a witness should Santos be granted a new trial.

Finally, the government points out in its response the wealth of evidence corroborating Medina's testimony. This included not only the testimony of Wilfredo Acosta, who jumped out of Core's van on the day of the murders, but also the

telephone records and the ballistic evidence linking Santos to the shooting.  For his part, Acosta testified that it was Medina, Core and Santos's intent to shoot and kill the inhabitants of the house on 101st Street and that Santos had admitted to the shooting weeks later.  A ballistics expert also testified that shell casings from the murder scene matched shell casings from a shooting in which Santos was implicated.  The telephone records provide further circumstantial evidence that demonstrates that Santos was with Medina in the calling center minutes after the shooting.  All of this evidence corroborating the mistaken-identity theory undermines Santos's argument that the new information is material.

**(2)**

**Brady and False Testimony Claims**

**a. Brady**

Santos's next claim is that the government's suppression of the informants' statements violated its Brady obligation to disclose favorable evidence to the defense.  As an initial matter, the prosecution's Brady obligation to disclose evidence does not extend to information it discovered after conviction. Dist. Attorney's Office for Third Judicial Dist. v. Osborne, — U.S. —, 129 S. Ct. 2308, 2319-20 (2009) (reaffirming that Brady is a pre-conviction trial right and holding that Brady does not

apply after conviction).  Thus, <u>Brady</u> is inapplicable to many of the government's disclosures.

"There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 (1999).  Prejudice, also known as "materiality," is established by demonstrating "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>

The admissibility standard governing what constitutes <u>Brady</u> material is less demanding on defendants than the Rule 33 standard.  The new information need not be admissible in evidence.  Rather, it must, at least, potentially lead to admissible evidence.  <u>E.g.</u>, <u>United States v. Rodriguez</u>, 496 F.3d 221, 226 n.4 (2d Cir. 2007) ("The objectives of fairness to the defendant, as well as the legal system's objective of convicting the guilty rather than the innocent, require that the prosecution make the defense aware of material information potentially leading to admissible evidence favorable to the defense."); <u>see</u>

19

also <u>United States v. Gil</u>, 297 F.3d 93, 104 (2d Cir. 2002)
(holding that information may qualify as <u>Brady</u> material if,
instead of leading to admissible evidence, it "would be an
effective tool in disciplining witnesses during cross-examination
by refreshment of recollection or otherwise").

The <u>Brady</u> obligation, however, does not extend to
information that is "preliminary, challenged, or speculative."
<u>United States v. Agurs</u>, 427 U.S. 97, 109 n.16 (1976) (internal
quotation marks omitted) (quoting <u>Giles v. Maryland</u>, 386 U.S. 66,
98 (Fortas, J., concurring)).  Thus, if the government
investigates conclusory, unsupported information and finds
nothing that would be of use to the defense, it need not disclose
that information.  <u>See</u> <u>United States v. Amiel</u>, 95 F.3d 135, 145
(2d Cir. 1996) (finding no <u>Brady</u> violation where the defendants'
allegation about a crucial trial witness's criminal activity was
supported only by a discredited source and the government's
follow-up yielded no proof of the alleged criminal activity).

The only statement that is considered here – because it was
available before trial – is the one given by CS-1 in early 2004.
As indicated, CS-1 had heard that Garces was killed at a red
light on Atlantic Avenue in retaliation for stealing drugs as
part of a Howland Hook break-in crew.

Like the other informants, CS-1 recounted mostly rumor and
speculation.  His accounts of the murders are characteristically

internally inconsistent: for instance, he claimed that he had
heard that "Harry" and then "Ronnie" had committed the murders
alone.  CS-1's proffer is also at odds with the undisputed
evidence presented at trial.  CS-1 asserted that Garces and Bryan
were killed on Atlantic Avenue in Brooklyn, when no one disputes
that they were killed in the parking lot in Queens.  Finally, CS-
1's pretrial proffers conflict with his post-trial statement, in
which he said that Chavez had killed Garces to avoid paying him
for stolen drugs.

Santos relies on DiSimone v. Phillips, 461 F.3d 181 (2d Cir.
2006), for the assertion that "'if there were questions about the
reliability of the exculpatory information, it was the
prerogative of the defendant and his counsel – and not of the
prosecution – to exercise judgment in determining whether the
defendant should make use of it.'" 2d Supp. Mem. of Law in
Support of Mot. for New Trial 19 (quoting DiSimone, 461 F.3d at
195).  However, in DiSimone the Brady material was a signed
statement made by a witness with personal knowledge of a third
party's confession to the killing for which the defendant was
convicted.  DiSimone, 461 F.3d at 192-93, 196.  In that case, the
late disclosure of the confession undermined confidence in the
guilty verdict by exposing the possibility that the wrong person
was convicted.  See id. at 196.

There is no corresponding concern here.  CS-1's allegations

are not admissible evidence since they are totally unsupported by
personal knowledge and consist of nothing but rumor.  Nor would
the disclosure of CS-1's statements have led to admissible
evidence since he failed to cite a source – and there is doubt
that he could, given the nature of his assertions.  Moreover,
even using a less demanding standard of admissibility such as
that for impeachment evidence, CS-1's statements would not be
admissible.  CS-1's speculative and conflicting versions of
events cast no doubt on the reliability of the corroborating
evidence supporting Santos's conviction.[9]  Under these
circumstances, the government had no duty disclose his
unsupported statements.

**b. False Testimony**

In a claim related to his <u>Brady</u> allegation, Santos argues
that, at trial, Medina presented a false version of how the
murders took place and that the government should have know about
the falsity based on CS-1's statement.  If the prosecution

_____

[9] In his reply, Santos accuses the government of committing
an "egregious violation of [his] constitutional rights by keeping
all of [the informants' statements] from the defense for over
four years."  CS-1's pre-trial statement was the only one subject
to analysis under <u>Brady</u>.  But were the other informants'
statements subject to that analysis, the government would
likewise have had no duty to disclose them.  Like CS-1's
statement, they were "preliminary, challenged, or speculative."
<u>Agurs</u>, 427 U.S. 97, 109 n.16 (1976) (internal quotation marks
omitted).

presents false testimony, a defendant's conviction based on that testimony will be reversed "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Bagley, 473 U.S. at 678 (internal citation and quotation marks omitted). However, the testimony must actually be false. To prove falsity, Santos rests on the assertions made by CS-1.[10] As already demonstrated, CS-1's statements were contradicted by the abundance of reliable corroborating evidence presented at trial and are far too tenuous to prove that Medina testified falsely.

### (3)

### Requests for Discovery and for an Evidentiary Hearing

Regarding Santos's discovery requests and motion to compel, the government has turned over most of the requested material in its possession relating to Santos's alternate theory in four letters. The letters of June 1 and December 31, 2009, detailed the six accounts summarized above and provided identifying information for Guerrero, Aguilar and Bermudes. The April 21, 2010, letter provided to defense counsel the names of CS-1, CS-2

---

[10] Santos also appears to rely on the statements given by the other informants. See 2d Supp. Mem. of Law in Support of Mot. for New Trial 11. However, since all of the statements other than CS-1's two pretrial proffers were given after trial, they cannot be used to support the conclusion that the government presented false testimony.

and CS-3.[11]  In that letter, the government provided what it
speculated were the true names of "Luisito" and "Willita
Montanyo."  The latest letter, dated June 11, 2010, and filed in
conjunction with the government's response, provided additional
pedigree and contact information for CS-1 and CS-2.  Since the
government has provided narratives of all of its notes pertaining
to the murders, including the identities of CS-1, CS-2 and CS-3,
most of Santos's discovery requests are moot.  However, the
government continues to maintain that Santos is not entitled to
view the government's interview notes because his request is
overly broad.  The government would, however, provide those notes
to the Court for <u>in</u> <u>camera</u> review. Because the informants'
statements are all conclusory, hearsay and speculative and cannot
overcome the overwhelming evidence of guilt, further discovery or
an <u>in</u> <u>camera</u> review would be unavailing.  For the same reasons
and because three of the informants have been deported, an
evidentiary hearing would likewise be futile.


**(4)**

### Motion for Resentencing under <u>Williams</u>

Santos also argues that, based on the Second Circuit's
decision in <u>Williams</u>, he is not subject to the ten-year mandatory

---

[11] This information was produced pursuant to an order that
also prohibits counsel from sharing its contents with defendant.

minimum under § 924(c).  Def.'s Mot. to Vacate Sentence on Gun

Charge 1-2, ECF No. 96.  Section 924(c)(1)(A) of Title 18

provides mandatory consecutive sentences for using, carrying or

possessing a firearm "during and in relation to any crime of

violence or drug trafficking crime" unless "a greater minimum

sentence is otherwise provided by this subsection or by any other

provision of law."  In Williams, the court, applying the plain

meaning of § 924(c)(1)(A), held that the "greater minimum

sentence" precluding the application of the § 924(c) mandatory

minimum sentence could be the sentence imposed for the underlying

predicate offense, in that case a drug trafficking crime.  558

F.3d at 171-72.  Although this reasoning would seem to apply to

Santos since he was subject to twenty-year mandatory minimum

sentences for Counts One and Two, the Second Circuit has not made

Williams retroactive, see United States v. Nolasco, No. 03-CR-

735, 2010 WL 1711870, at *3 (S.D.N.Y. Apr. 28, 2010), and the

government's petition for certiorari is still pending in the

Supreme Court, Williams, 558 F.3d 166, petition for cert. filed,

78 U.S.L.W. 3254 (Oct 20, 2009) (No. 09-466).  Moreover, as the

government points out, Santos is still subject to two life

sentences, Gov't letter, Apr. 20, 2009, ECF No. 106, and the

Court retains the authority at sentencing "to select any

appropriate sentence, consistent with 18 U.S.C. § 3553(a),

whether or not pursuant to the Guidelines" above Santos's

mandatory minimum sentence, <u>see</u> <u>United States v. Whitley</u>, 529
F.3d 150, 158 (2d Cir. 2008).  Accordingly, Santos's motion to
vacate his § 924(c) sentence is denied.


## Conclusion

For the foregoing reasons, Santos's motion for a new trial
pursuant to Rule 33 of the Federal Rules of Criminal Procedure
and <u>Brady</u> and his motion for resentencing are denied.
Furthermore, his motion to compel and requests for an evidentiary
hearing and discovery are denied.


Dated:     Brooklyn, New York
           July 27, 2010

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge