

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

PTH:GSM
F. #2021V01353

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 7, 2021

By ECF

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Manuel Santos
                  Criminal Docket No. 01-537-01 (ARR)

Dear Judge Ross:

      The government submits this letter in opposition to defendant Manuel Santos's second pro se motion for compassionate release and/or sentence reduction under Title 18, United States Code, Section 3582(c)(1)(A)(i).  See ECF No. 182 (Sep. 17, 2021) (the "Second Motion").[1]  The government respectfully submits that the Court should deny the defendant's Second Motion because, as set forth below, the defendant has not demonstrated extraordinary and compelling reasons for release and the factors in Title 18, United States Code, Section 3553(a) weigh against his release.

I.      Offense Conduct and Sentencing[2]

      The defendant, who has a long history of violent and deadly conduct, is serving concurrent life sentences for the premeditated murder-for-hire killings of two victims.  After lying in wait for hours, the defendant trapped his victims in a parking lot and executed them with a 10-millimeter handgun.  Adding to the depravity of his conduct, the defendant killed the wrong people, one of whom was a fourteen-year-old boy.

---

    [1]  Because the exhibits to this letter refer to the defendant's personal health or other confidential information, the government respectfully requests permission to file the exhibits under seal.

    [2] The information set forth in this section, except where specifically noted, is drawn from the Presentence Investigation Report dated February 4, 2005, the government's sentencing memorandum filed October 24, 2005, ECF No. 65, and the judgment docketed by the Court on February 17, 2006, ECF No. 67.

In September 2000, the defendant and his co-conspirator, Alex Core, were hired to murder two men, "Ronnie" and "El Renco." Presentence Investigation Report ("PSR") ¶ 3. The murder targets had stolen over $300,000 in narcotics proceeds from a drug dealer named German Polanco. Id. In turn, Polanco directed co-conspirator Carlos Medina to offer the defendant and Core $7,500 each to kill both men. Id.

On September 26, 2000, the defendant, Core, and Medina met in Brooklyn and began a day-long stakeout of the house where they believed "Ronnie" and "El Renco" were staying. Id. ¶ 4. The three men initially arrived at the parking lot in front of the house that morning in Core's van. After concluding that the parking lot was an appropriate place to carry out the murders, they drove to the defendant's home to retrieve his 10-millimeter pistol. They then picked up a fourth person, returned to the parking lot, and continued to wait. See id.

In the middle of the day, the men chased a BMW they thought to be carrying one of the targets. During the chase, the defendant instructed one of his co-conspirators to pull up next to the BMW so that he could shoot the driver. However, the BMW successfully eluded them, so the men drove off and exchanged Core's van for the defendant's SUV. See id. They then returned to the parking lot for the final time and continued to wait. See id.

After waiting for approximately ninety minutes longer, the men saw two individuals walk out of the house and get into a small car. See id. Incorrectly believing these individuals to be "Ronnie" and "El Renco," the defendant used the SUV to block their exit from the parking lot. Id. He and Core then jumped out of the SUV and surrounded the car. Id. The defendant then began firing into the driver's side of the victims' car. See id. Although Core approached the passenger side, his gun malfunctioned, so the defendant continued firing, killing both the driver and passenger. Id.

Following the shooting, the men fled the scene, ditched the defendant's SUV and their weapons, and took a taxi to another location to collect their payment for the killings. Id. ¶¶ 4-5. It was only later that they learned the defendant had killed the wrong people. Id. ¶ 4. Instead of "Ronnie" and "El Renco," the defendant killed Wilber Garces and his fourteen-year-old passenger, Edgardo Bryan. Id.

The defendant has a lengthy and violent criminal history. Id. ¶¶ 6-7, 28-32. In addition to the defendant's two 1990 weapons convictions, one of which involved shooting a firearm at another person, the defendant was also involved in a previous killing. Id. ¶¶ 29, 31-32.

Following the Garces/Bryan slaying, New York City Police Department ("NYPD") ballistics experts confirmed that ballistic evidence recovered from the crime scene, including from the victims' bodies and the victims' car, all came from a single 10-millimeter firearm. Id. ¶ 6. In addition, the NYPD ballistics database indicated that this same 10-millimeter firearm had been used in several other shootings, including the May 1999 shooting of Mahase Lall, for which the defendant was convicted in September 2003. Id. ¶¶ 6, 32. Testimony from that trial indicated that the defendant brought a firearm to a bar in Brooklyn, where he became involved in an argument. Id. ¶ 32. When the argument escalated, the defendant drew his firearm and, although it is unclear whether he intended to fire it, the gun discharged, killing Lall. Id.

After his conviction in New York State Supreme Court for the Lall killing, the defendant was sentenced to serve five to 10 years for manslaughter to run concurrently with a sentence of eight years' custody for the criminal possession of a firearm. Id. However, New York State surrendered the defendant to the custody of the U.S. Marshals Service in December 2003 and the defendant was convicted in this Court, following trial, on November 19, 2004, for the Garces/Bryan murders. See id. ¶¶ 1, 32. On October 28, 2005, U.S. District Judge David G. Trager sentenced the defendant to concurrent life sentences for the Garces/Bryan murders, as well as 120 months' consecutive imprisonment for the use of a firearm during a crime of violence under 18 U.S.C. § 924(c)(1)(A)(iii). ECF No. 67.

The defendant was transferred from United States Penitentiary Coleman II to Federal Correctional Institution ("FCI") Otisville in February 2021. See Inmate Profile (attached as Exhibit 1). He is currently incarcerated at FCI Otisville, where he continues to serve concurrent life sentences.

On September 17, 2021, the defendant, who is 62 years old, filed the Second Motion. He argues that a reduced sentence is warranted principally because of (1) his age and purported medical conditions, (2) the conditions of his incarceration, (3) the length of his sentence, and (4) his claimed rehabilitation.

II.    The Defendant's Initial Motion and the Instant Request for Relief

The defendant filed an initial motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) on January 12, 2021. See ECF No. 176. The government filed a response in opposition on January 25, 2021, see ECF No. 178 (attached as Exhibit 2), and the Court issued an Opinion and Order denying the defendant's motion on February 8, 2021 (the "Feb. 8 Order"). See ECF No. 179. The Court's Feb. 8 Order denied the defendant's motion on the basis that the defendant failed to exhaust his administrative remedies. See Feb. 8 Order at 5-6. However, the Court also noted that, even had the defendant properly exhausted his administrative remedies, the Court would have denied the defendant's motion on the merits. See id. at 6-10. This was because the defendant had "not carried his burden to demonstrate both that extraordinary and compelling reasons warrant his release and that the § 3553(a) sentencing factors weigh in favor of release." See id. at 6.

On June 18, 2021, the defendant submitted a letter to the Warden of FCI Otisville seeking compassionate release based on the defendant's diabetes and "Institutional Adjustment." See Second Mot. at Ex. A. The Warden denied the defendant's request on August 5, 2021. See id. at Ex. B.

By motion filed on September 17, 2021, the defendant now moves this Court for compassionate release and/or sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Second Mot. at 1. The defendant argues that his immediate release is warranted because of his "substantial risk of contracting COVID-19, the pandemic's effects on his conditions of confinement, his rehabilitation during 21 years in prison, the extreme length of his sentence, and the length of time he has already served." Second Mot. at 7.

III.     Current Status of COVID-19 Cases at FCI Otisville

FCI Otisville, in which the defendant is currently incarcerated, is a medium security federal correctional institution with an adjacent minimum security satellite camp and a detention center. To date, there have been no inmate or staff deaths at the facility caused by COVID-19, and 79 inmates and 45 staff members have recovered after testing positive for COVID-19. See Bureau of Prison's ("BOP") COVID-19 statistics by facility, at https://www.bop.gov/coronavirus/, last visited on October 7, 2021. As of October 7, 2021, four of FCI Otisville's staff members are currently positive for COVID-19. Moreover, none of FCI Otisville's 555 inmates are currently positive for COVID-19. Id. These numbers reflect the BOP's hard work to control the spread of the virus at the facility, which has included implementing the following measures, among others: facility-wide use of face coverings by inmates and staff; social distancing in all areas; staff symptom screening, including daily COVID-19 symptom screening and temperature checks prior to entry into the institution; provision of hand sanitizer and masks; contact tracing; quarantining inmates who test positive for COVID-19; and quarantining inmates before arriving at or departing from the facility.

BOP has also received 237,192 doses and administered 229,171 doses of the COVID-19 vaccine. Id. At FCI Otisville, 122 staff members and 524 inmates have fully been vaccinated. Id. Importantly, the defendant was fully vaccinated with the Johnson & Johnson Janssen COVID-19 vaccine on May 25, 2021. See Second Mot. at 15; BOP Medical Records for Manuel Santos at MS-MED-057 (attached as Exhibit 3); Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/janssen.html, last visited on October 7, 2021.

IV.     Legal Framework

"A district court may not generally modify a term of imprisonment once it has been imposed," except pursuant to a statutory grant of authority. United States v. Savoy, 567 F.3d 71, 72 (2d Cir. 2009) (internal quotation marks omitted); see also United States v. Bernabal, 22 F. App'x 37, 41 (2d Cir. 2001) (quoting United States v. Mendoza, 118 F.3d 707, 709 (10th Cir. 1997) and collecting cases). Section 3582(c) is one source of such authority. That authority is limited, however, by the substantive provision in § 3582(c)(1)(A)(i) that forms the basis of the defendant's motion.

    A.     Section 3582 Before the FSA

The substantive provision in § 3582(c)(1)(A)(i) dates to 1984 and was unchanged by the First Step Act of 2018, Pub. L. 115-391, § 603(b), 132 Stat 5239 (Dec. 21, 2018) ("FSA"). Section 3582 was enacted in the Sentencing Reform Act of 1984, and, since its enactment, it has provided that a court may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i); Sentencing Reform Act of 1984, Pub. L. 98-473, 98 Stat. 1999 (Oct. 12, 1984).

The procedural provision that serves as a gatekeeper for this form of relief was unchanged in relevant part between its enactment in 1984 and the FSA. Prior to the FSA, it

4

provided that a district court's authority to grant relief under § 3582(c)(1)(A)(i) or (ii) was predicated on a "motion of the Director of the Bureau of Prisons." See 18 U.S.C. § 3582(c)(1)(A) (2017); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. 107–273, § 3006, 116 Stat 1758 (Nov. 2, 2002) (enacting the last amendment to § 3582(c)(1)(A) before the FSA). Before the FSA, the absence of a motion from the BOP on behalf of an inmate seeking compassionate release was a jurisdictional defect that precluded relief in federal courts. See, e.g., Rodriguez-Aguirre v. Hudgins, 739 F. App'x 489, 491 (10th Cir. 2018) (holding that pre-FSA version of § 3582(c) gave "the BOP absolute discretion regarding whether to file a motion, and the BOP's denial of a defendant's compassionate release/reduction in sentence request and declination to file a motion [wa]s not a judicially reviewable decision," and collecting cases); Garafola v. United States, 909 F. Supp. 2d 313, 339 (S.D.N.Y. 2012) (same and collecting cases).

B.  Section 3582 After the FSA

The FSA modified the procedural provision in § 3582(c)(1)(A). Rather than requiring a motion from the Bureau of Prisons, § 3582(c)(1)(A) now provides that a federal court has jurisdiction to review a request for relief under the following circumstances:

> [(1)] upon motion of the Director of the Bureau of Prisons, or [(2)] upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [(3)] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A); First Step Act of 2018, Pub. L. 115-391, § 603(b), 132 Stat 5239 (Dec. 21, 2018). This amendment to § 3582(c)(1)(A) is included in the FSA under the heading "Increasing the Use and Transparency of Compassionate Release." Id.

Under the FSA, where a defendant has satisfied the exhaustion provision of § 3582(c)(1)(A), a district court "may reduce the term of imprisonment . . . after considering the factors set forth in [S]ection 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." See id. The "applicable policy statement[]" is found in U.S.S.G. § 1B1.13, which provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "[t]he reduction is consistent with this policy statement," id. § 1B1.13(3).

Consistent with Congress's delegation of authority to the Sentencing Commission to define the term "extraordinary and compelling reasons," see 28 U.S.C. § 994(t), the application note to § 1B1.13 defines that phrase. The application note provides that "extraordinary and compelling reasons exist under any of the circumstances set forth below," and it sets forth four categories: the "Medical Condition of the defendant," the "Age of the

defendant," "Family Circumstances," and "Other Reasons . . . [a]s determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13, App. Note 1(A)-(D).

In addition to his age and purported medical conditions, the defendant relies on the "Other Reasons" clause in the instant motion. That clause further provides for relief where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Id. § 1B1.13, App. Note 1(D).

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Gotti, No. 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

Additionally, regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, the Section 3553(a) factors are relevant to whether release is warranted. See 18 U.S.C. § 3582. In fact, the existence of "extraordinary and compelling reasons" per se does not compel compassionate release if the Court determines that the Section 3553(a) factors warrant continued imprisonment. See, e.g., Gotti, 433 F. Supp. 3d at 615 ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."); accord United States v. Efrosman, No. 06-CR-95 (NGG), 2020 WL 4504654, at *2 (E.D.N.Y. Aug. 5, 2020).

    C.    The Second Circuit's Zullo Decision

The Second Circuit in United States v. Brooker ("Zullo"), 976 F.3d 228 (2d Cir. 2020), provided further guidance to district courts on the "Other Reasons" clause of U.S.S.G. § 1B1.13. The Circuit explained that it "cannot constrain district courts' discretion to consider whether any reasons [presented in a motion for compassionate release] are extraordinary and compelling." Id. at 236.

Since this Court decided Zullo, several Circuits have reached the same conclusion about the "applicability" of § 1B1.13 to defendant-filed motions. See, e.g., United States v. McCoy, No. 20-6821, 2020 WL 7050097 (4th Cir. Dec. 2, 2020); United States v. Shkambi, 993 F.3d 388, 393 (5th Cir. 2021); United States v. Jones, 980 F.3d 1098, 1100 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); United States v. Aruda, 993 F.3d 797 (9th Cir. 2021); United States v. McGee, 992 F.3d 1035, 1050–51 (10th Cir. 2021); but see United States v. Bryant, No. 19-14267, 2021 WL 1827158, at *14 (11th Cir. May 7, 2021) (holding district courts are bound by § 1B1.13).

6

V.   Argument

The government does not minimize the risk COVID-19 poses for inmates with underlying medical conditions. However, there is only a narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release. The defendant has not shown his age, medical conditions, or the length and conditions of his incarceration to be sufficiently "extraordinary and compelling" to warrant release. Additionally, even if the defendant could make such a showing, his motion should be denied because the Section 3553(a) factors weigh in favor of the defendant's continued incarceration.

A.   The Defendant Has Not Shown That His Circumstances Are "Extraordinary and Compelling"

Earlier this year, the defendant filed an initial motion for compassionate release seeking termination of his custodial sentence primarily because he previously tested positive for COVID-19, was 61 years old, and had purportedly "compromised physical health." See ECF No. 176 at 4. The Court's Feb. 8 Order denied the defendant's motion, noting that he had not established "extraordinary and compelling reasons warranting his release." See Feb. 8 Order at 6.

The defendant's Second Motion now seeks termination of his custodial sentence primarily because he is 62-years old, was recently diagnosed with diabetes, is purportedly obese, and has been incarcerated during the COVID-19 pandemic and for a total of 20 years. Yet, as did his initial motion, the defendant's Second Motion fails to identify "extraordinary and compelling reasons" for his release, even under Zullo, 976 F.3d at 237. The defendant has not shown that his age, health, or incarceration constitute an extraordinary and compelling reason warranting his release.

First, the defendant has not submitted any evidence indicating that he is obese. Additionally, the defendant's representation that he is obese appears to be predicated on the miscalculation of his body mass index ("BMI") as 30. See Second Mot. at 4. As indicated by the defendant's own submission, he weighed 154 pounds on March 8, 2021, and claims to be 5'6" tall. Id. at 4, Ex D. In light of his height and weight, the defendant's body mass index ("BMI") is approximately 24.9, not 30. See Centers for Disease Control and Prevention ("CDC") Adult BMI Calculator, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html, last visited on October 7, 2021. Contrary to his claim, the defendant's BMI of 24.9 means the defendant is in a healthy weight range and is not obese. See CDC About Adult BMI, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html, last visited on October 7, 2021; see also National Heart, Lung, and Blood Institute Calculate Your Body Mass Index, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm, last visited on October 7, 2021. In contrast, the defendant does appear to have been diagnosed with Type 2 diabetes in July 2021. See Second Mot. at Ex. C.

Second, even though the defendant appears to have recently been diagnosed with diabetes, and even if the defendant were obese, his medical conditions and age still do not constitute extraordinary and compelling circumstances warranting a reduced sentence. Courts in the Second Circuit have repeatedly rejected compassionate release claims even in circumstances where an inmate has conditions that may put him or her at higher risk related to COVID-19 than

7

the typical inmate. In fact, courts in this Circuit have denied numerous compassionate release applications involving inmates who suffer from similar or even more serious health conditions than the defendant and/or were at least 62 years old. See, e.g., United States v. Barnett, No. 90-CR-913 (LAP), 2021 WL 3550217 (S.D.N.Y. Aug. 10, 2021) (denying application where 67-year-old defendant suffered from Type 2 diabetes, glaucoma, cataracts, hypertension, an enlarged prostate, and a prolonged, dry cough); United States v. Borelli, No. 84-CR-63 (LAP), 2021 WL 2228075 (S.D.N.Y. June 2, 2021) (denying application where 72-year-old defendant suffered from diabetes, hypertension, heart disease, and cataracts); United States v. Bennett, No. 13-CR-17S (1), 2021 WL 2410535, at *4 (W.D.N.Y. June 14, 2021) (denying application where defendant suffered from diabetes, hypertension, hyperlipidemia, and obesity); United States v. Steele, No. 3:19-CR-65-VLB-12, 2021 WL 2138829, at *6 (D. Conn. May 26, 2021) (denying application where defendant suffered from hypertension, asthma, dyslipidemia, obesity "with a BMI of 31.3" and post-operation small bowel resection); United States v. Rivers, 03-CR-01120 (FB), 2020 WL 5043931, at *1 (E.D.N.Y. Aug. 26, 2020) (denying application made by 72-year-old defendant who suffered from "stable, albeit chronic, medical issues"); United States v. Donato, 03-CR-929-9 (NGG), 2020 WL 3642854, at *1 (E.D.N.Y. July 6, 2020) (denying application made by 62-year-old defendant who suffered from, among other conditions, hyperlipidemia, premature atrial contractions, a history of pneumonia and continuing upper respiratory ailments, a lipid disorder, and high cholesterol"); United States v. Weingarten, 08-CR-571 (BMC), 2020 WL 2733965, at *2 (E.D.N.Y. May 26, 2020) (denying application from 70-year-old defendant who alleged "kidney, bladder, and urinary conditions, as well as . . . an unspecified prostate disorder, pericarditis, and 'heart problems'"); United States v. Gioeli, 08-CR-240 (BMC), 2020 WL 2572191, at *1 (E.D.N.Y. May 21, 2020) (denying motion made by 67-year-old racketeering defendant who, among other ailments, has diabetes, has had heart attacks and heart surgery); United States v. Collier, 12-CR-6003 (CJS) (E.D.N.Y. May 8, 2020) (denying relief for 62-year-old defendant with "several severe health problems, including lupus, high blood pressure, hepatitis C, and a spot on her lung"); United States v. Baker, 97-CR-877 (DRH) (Apr. 21, 2020) (denying relief for 81-year-old defendant who needs a walker to get around and suffers from "diabetes, hyperlipidemia, anemia, carpal tunnel syndrome, glaucoma, hypertension, angina, hemorrhoids, periodontitis, dermatitis, urinary incontinence, retinopathy, heart disease, chronic kidney disease and lower back pain"). In addition, as the defendant concedes, he is vaccinated for COVID-19. See Second Mot at 15. Although the defendant argues that "he still faces some risk of infection," courts in this Circuit have repeatedly denied compassionate release applications made by vaccinated defendants. See, e.g., Barnett, 2021 WL 3550217, at *3 ("[T]he Court finds that [67-year-old defendant with Type 2 diabetes] is no longer at high risk for severe illness caused by COVID-19, and this Court joins others which have held that such a defendant cannot establish extraordinary and compelling reasons for his release on that ground." (citations omitted)); United States v. Perelda, No. S1 17 CR 559 (VB), 2021 WL 2533475, at *2 (S.D.N.Y. June 21, 2021) ("Moreover, the FDA-approved vaccines are effective against the variants currently spreading in the United States . . . . Perelda's full vaccination means his health conditions that might otherwise weigh in favor of reducing his sentence do not constitute extraordinary and compelling reasons warranting an early release." (citations omitted)); United States v. Alvarez, No. 18-CR-656 (LTS), 2021 WL 3550218, at *3 (S.D.N.Y. Aug. 10, 2021) ("The J&J vaccine also appears to be 'highly effective in preventing severe illness and death from the Delta and Beta variants of the coronavirus[.]'" (citing The New York Times, New data suggest J. & J. vaccine works against Delta and recipients don't need a

Case 1:01-cr-00537-ARR   Document 184   Filed 10/07/21   Page 9 of 12 PageID #: 2239

booster shot, https://www.nytimes.com/2021/08/06/science/johnson-delta-vaccine-booster.html (last visited September 26, 2021)); Steele, No. 3:19-CR-65-VLB-12, 2021 WL 2138829, at *6 (D. Conn. May 26, 2021) (denying application from vaccinated defendant who was obese "with a BMI of 31.3.")

Third, in addition to his age and purported medical conditions, the defendant claims that the pandemic "has made [his] incarceration more punitive than anticipated by the Court." See Second Mot. at 18-20. Specifically, the defendant claims that "inmates live in constant fear of contracting a deadly virus . . . face lockdowns . . . cold meals, and drastically reduced recreational time, programming, and employment and educational opportunities." Id. at 18. However, "these hardships do not set [the defendant] apart from the rest of the BOP inmate population and therefore do not, alone, constitute extraordinary and compelling reasons for his release." United States v. Johnson, No. 98-CR-860(7) (ARR), 2021 WL 1207314, at *4 (E.D.N.Y. Mar. 31, 2021). Moreover, the defendant is currently housed in a BOP facility with zero COVID-19 cases among the inmate population and FCI Otisville has not had a single inmate or staff death caused by COVID-19. See BOP COVID-19 statistics by facility, at https://www.bop.gov/coronavirus/, last visited on October 7, 2021.

Finally, the defendant indicates that, in addition to the conditions of his confinement, the length of his confinement constitutes extraordinary and compelling circumstances warranting a reduced sentence. See Second Mot. at 20-21.[3] It does not. In making this argument the defendant ignores the extremely violent nature of his crimes, including the fact that one of the victims he executed was an innocent young boy. See id. The defendant also fails to mention his violent criminal history, which led him to be in a Criminal History IV at the time of his sentencing. See id.; PSR ¶ 28-33. In addition, the defendant carried out the Garces/Bryan murders days before the defendant's 41st birthday. See PSR at 1 (listing the defendant's date of birth as September 30, 1959), ¶ 4. The defendant was not a young offender who lacked appreciation for the nature and implications of his conduct but was, instead, a 40-year-old man who carried out a cold-blooded plan to trap and execute two people. Nor has the defendant, aside from submitting four certificates, see Second Mot. Ex. F, provided any evidence of his rehabilitation. The defendant is, thus, not similarly situated to the defendants in the cases he cites to support his argument that the length of his sentence for murdering Wilber Garces and Edgardo Bryan constitutes an extraordinary and compelling circumstance. See, e.g., United States v. Rodriguez, 492 F. Supp. 3d 306, 308 (S.D.N.Y. 2020) (denying request for immediate release but reducing sentence from life to 30 years' custody and lifetime supervised release where the defendant provided "[a]n extraordinary collection of letters—from fellow inmates, family, friends, and, most important, 27 members of the prison staff" that made clear that he was "wholly rehabilitated."); United States v. Cruz, No. 3:94-CR-112 (JCH), 2021 WL 1326851, at *1 (D. Conn. Apr. 9, 2021) (granting application where defendant who had effectively served

---

[3] The defendant incorrectly represents that he "was sentenced in 2002 . . . . [when] the Guidelines were mandatory." The defendant was in fact sentenced on October 28, 2005, at which point the United States Supreme Court had held that the Sentencing Guidelines were advisory. See PSR ¶ 28 ("the Sentencing Guidelines must be consulted, but are advisory"); Minute Entry for Sentencing, ECF No. 66 (Oct. 28, 2021); United States v. Booker, 543 U.S. 220 (2005).

9

almost 31 years of a life sentence was 18 years old at the time of the crime and had shown "extraordinary rehabilitation). !!!

In sum, none of the circumstances the defendant cites in support of his release, whether considered individually or in combination, present a set of circumstances where "it would be inequitable to continue the confinement of the prisoner." See United States v. Traynor, No. 04-CR-0582, 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). Moreover, even if the defendant established that extraordinary and compelling reasons militated in favor of his release—which he does not—he must also establish that the sentencing factors enumerated in 18 U.S.C. § 3553(a) would be served by his release. As this Court found earlier this year, he cannot. See Feb. 8 Order at 9-10.

B. The Section 3553(a) Factors Militate Against Release

Finally, even if the Court were to conclude that the defendant has demonstrated "extraordinary and compelling" reasons for his release, balancing such reasons against the factors set forth in Section 3553(a) demonstrates that the defendant should remain in custody.

1. The Nature and Circumstances of the Offense

First, the extremely serious and violent nature of the defendant's offense is not in dispute, as he not only executed two people in cold blood but did so in expectation of being paid and after lying in wait for hours. Even worse, he killed the wrong targets, slaying a young boy.

As described above, after trapping his victims in a parking lot, the defendant used his 10-millimeter pistol to kill Wilber Garces and, after his accomplice's pistol jammed, the defendant continued shooting until he also killed fourteen-year-old Edgardo Bryan. PSR ¶ 4. Accordingly, "the nature and circumstances of the defendant's offenses are of the utmost seriousness, see Feb. 8 Order at 9, and this factor therefore counsels firmly in favor of the defendant's continued incarceration.

2. The History and Characteristics of the Defendant

Second, the defendant's pattern of disrespect for the law and disregard for human life also weigh in favor of his continued incarceration. The defendant's federal charge of conviction was not an isolated incident. In fact, he was involved in at least one other killing. As described above, more than a year before killing Garces and Bryan, the defendant brought a gun to a bar in Brooklyn, drew it during an argument, and killed Mahase Lall. PSR ¶ 32.

In addition to his murder and manslaughter convictions, the defendant has two 1990 weapons convictions, one of which involved shooting a firearm at another person. Id. ¶¶ 29, 31. As discussed above, ballistics evidence from the Garces/Bryan murders connected the defendant's firearm not only to the Mahase Lall killing, but also to a July 1998 assault and another shooting at a restaurant in February 2000. Id. ¶ 6.

Also, while incarcerated, the defendant has displayed a disregard for authority, as evidenced by his disciplinary violations. Although the defendant has not had any disciplinary violations in several years, he has had six violations during his incarceration, including

December 2013 and September 2012 violations for possessing a weapon. See Inmate Disciplinary Record (attached as Exhibit 4).

>   3.   Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment

Third, reducing the defendant's sentence would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment. The defendant is principally serving concurrent life sentences for the Garces/Bryan murders. To reduce the defendant's sentence would diminish his transgressions and undermine the goals of the original sentence, including dispensing adequate punishment for the defendant's violent criminal behavior. See United States v. Bolino, No. 06-CR-806 (BMC), 2020 WL 4749807, at *1 (E.D.N.Y. Aug. 17, 2020), reconsideration denied, No. 06-CR-806 (BMC), 2020 WL 6136258 (E.D.N.Y. Oct. 19, 2020), aff'd sub nom. United States v. Souza, No. 20-3829, 2021 WL 3871262 (2d Cir. Aug. 31, 2021), and aff'd sub nom. United States v. Souza, No. 20-3829, 2021 WL 3871262 (2d Cir. Aug. 31, 2021) (denying release where doing so would, inter alia, undermine the goals of the original sentence, including punishing the defendant and deterring others from emulating him).

>   4.   Affording Deterrence and Protecting the Public

Fourth, the defendant should be required to continue serving his sentence to promote both general and specific deterrence. There is a great need for general deterrence for violent offenses like the Garces/Bryan murders, where the impact on victims, their families, and their communities is so devastating. See United States v. Suero, 11-CR-84 (PAE), 2020 WL 4548043, at *4 (S.D.N.Y. Aug. 6, 2020) (denying release because, inter alia, "Potential doers of such extreme wrongs [as murder-for-hire] need to be held in check as much as possible by the prospect of a life-altering sentence.") (internal quotation marks and citation omitted). Additionally, there is a strong need for specific deterrence where the defendant has been convicted in connection with three killings, has several other weapons convictions, and has had multiple disciplinary violations during his incarceration, including for possessing a weapon. See Exhibit 4 at 1.

Moreover, evidence strongly suggests that the defendant continues to pose a danger to the safety of others and the community. His involvement in multiple killings, the violent nature of his other offenses, the fact that he was nearly 41 years old at the time of the Garces/Bryan murders, and his repeated disciplinary infractions while incarcerated, show that his release would undermine the public safety.

11

VI.     Conclusion

   The defendant's motion should be denied because he has not demonstrated "extraordinary and compelling reasons" justifying his release and consideration of the 18 U.S.C. § 3553(a) factors warrants his continued detention.

                   Respectfully submitted,

                   JACQUELYN M. KASULIS
                   Acting United States Attorney

            By: /s/ Garen S. Marshall
               Garen S. Marshall
               Assistant U.S. Attorney
               (718) 254-6569

cc:  Clerk of Court (ARR) (by ECF)
    Manuel Santos, pro se (via certified mail)